# AMENDED EXHIBIT 1
# to Declaration of Angelo A. Stio III

(with redactions)

**In the Matter Of:**

In re: Daniel's Law Compliance Litigation

---

**MATTHEW WILLIAM ADKISSON**

*July 30, 2024*

---

*30(b)(6), Confidential*



800.211.DEPO (3376)
EsquireSolutions.com

1    Q.    And when you say discovery requests and

2    searches, was that related to finding documents?

3    A.    Yes.

4    Q.    Anything else?

5    A.    I spoke to them about things beyond

6    that, but -- sorry.  I am not sure I totally

7    understand the question.

8    Q.    Sure.  You said that you spoke to them

9    about discovery requests and I think we said it's

10   document requests, but was there any other type of

11   requests that you spoke to them about with regards

12   to this litigation?

13   A.    My understanding is that my role at a

14   30(b)(6) deposition is to speak as a

15   representative of the company, so I spoke to them

16   to make sure that I could fulfill that obligation,

17   that I had an understanding of certain things they

18   may have known or not known or done or not done so

19   that I could represent on behalf of the company

20   that the employees either knew something or didn't

21   know something or had done or not done something.

22   Q.    Okay.  In the list of employees, are

23   those all the employees that currently work at

24   Atlas that you gave just now?

25   A.    I believe so.



1      Q.    Okay.  You also said you spoke to

2  partners.  Who are those partners?

3      A.    Just people on that same list.  I would

4  use that -- I use that term interchangeably,

5  business partners and employees.

6      Q.    Do the partners have an ownership

7  interest in Atlas?

8      A.    Yes.

9      Q.    Okay.  Are the partners who have an

10  ownership interest in Atlas the same individuals

11  who are all employees?

12      A.    I think everyone on that list could be

13  considered to have an ownership interest in Atlas.

14      Q.    ██████████████████████████

15  ████████████████████████████████████

16  ██████████████████████████████████

17  █████████████████

18      A.    ████

19      Q.    ██████████████

20      A.    ████████████████████████████

21  ███████████████████████████████

22  ████████████████████████████████

23  ████████████████████████████████

24  ██████████

25      Q.    Say that again.  I'm sorry.



1      A.    Y Combinator, the startup accelerator.

2      Q.    Okay.

3      A.    Tom Kemp.  And then other individuals.

4  I don't recall exactly.  I haven't looked at the

5  cap table in a while, so I couldn't tell you who

6  else is on there with confidence.

7      Q.    But in terms of entities, Lightspeed

8  and Y Combinator are the two entities that are

9  shareholders or investors in Atlas; is that

10 correct?

11           MR. LEE:  Counsel, I have allowed you

12      to get into the background, but what does

13      this have to do with subject matter

14      jurisdiction?  Is this a discovery deposition

15      or a --

16           MR. STIO:  I'm getting to that.

17           MR. LEE:  -- deposition limited to

18      subject matter jurisdiction?  Please get to

19      it.

20      A.    Can you repeat that last question.

21           (Record read.)

22      Q.    Let me rephrase that.

23           Are Lightspeed and Y Combinator the

24 only entities that are investors in Atlas?

25      A.    There is also Share Capital that is



```
 1   another entity, and then some of the individual
 2   angel investors may have invested through an
 3   entity.  I don't recall.
 4        Q.    Okay.  Do you know the principal place
 5   of business for Lightspeed Venture Partners, where
 6   it's located?
 7        A.    I do not.
 8        Q.    Do you know the principal place of
 9   business for Y Combinator?
10        A.    I'd be speculating.  I don't.
11        Q.    Okay.  Do you know the principal place
12   of business for Share Capital?
13        A.    Again, I'd be speculating.
14        Q.    Do you own the majority share in Atlas?
15        A.    ███████████████████████████████████
16   ████████████████████████████████████████████
17   ████████████████████████████████████████████
18   ████████████████████████████████████████
19   ████████
20        Q.    ████████████████████████████
21        A.    ██████████
22        Q.    ████████████████████████████████████
23   ██████████████████████████████████████
24        A.    ████████████████
25        Q.    Mr. Adkisson, can you give us a little
```



1   bit of your education background.

2               MR. STIO:  And I would like to mark a

3         bio that was on LinkedIn.  This is going to

4         be Exhibit 1.

5               (Atlas Exhibit 1, Matt Adkisson

6         LinkedIn bio printout, marked for

7         identification.)

8               MR. PARIKH:  Angelo, you are calling it

9         Atlas 1 or just exhibit?

10              MR. STIO:  Atlas 1.

11        Q.    Mr. Adkisson, have you ever seen this

12   before, which is Atlas 1?

13        A.    I have not.

14        Q.    Okay.  Do you have a LinkedIn account?

15        A.    I do.

16        Q.    Okay.  Do you have any reason to

17   believe that this Atlas 1 isn't a printout of your

18   LinkedIn account?

19        A.    If you would like, I can go through it.

20   Let me -- let me go through it and I will make

21   sure that it's accurate.

22              (Document review.)

23        A.    There are certain parts of it that are

24   obfuscated or not expanded, as I am sure you can

25   see, but generally it seems to be accurate, yes.



```
 1          Q.    Okay.  And your undergrad degree, where
 2     is that from?
 3          A.    I do not have an undergraduate degree.
 4          Q.    Okay.  You attended Massachusetts
 5     Institute of Technology?
 6          A.    I did.
 7          Q.    From what years?
 8          A.    From 2001 until sometime in 2006 and I
 9     did take some time off -- the attendance was not
10     continuous.  Took some time off within those time
11     periods.
12          Q.    Okay.  Did you attend any other
13     colleges?
14          A.    Yes.
15          Q.    What colleges did you attend?
16          A.    Stanford.  Brown.  The Naval War
17     College.  Harvard.  I think those were the main
18     ones.
19          Q.    Got it.  What period of time did you
20     attend Stanford?
21          A.    I believe it was 1998 to 1999 for one
22     semester.
23          Q.    Was that the first college you attended
24     after you graduated from high school?
25          A.    I did not graduate from high school.
```



```
 1        A.     You would have to ask him.
 2        Q.     Okay.  Do you have an understanding of
 3   why Mr. Rhome left Atlas?
 4        A.     You would have to ask him.
 5        Q.     But I am asking you if you have an
 6   understanding.  Do you know?
 7        A.     My understanding is that there are
 8   parts of his departure that are covered under NDA,
 9   so I'm not sure how much I can go into, but my
10   understanding is broadly that he no longer wanted
11   to continue working at the company and the company
12   wanted to go its own way.
13        Q.     Okay.  Do you have an understanding of
14   why Mr. Young left Atlas?
15        A.     I would give the same answer for
16   Mr. Young that I gave for Mr. Rhome.
17        Q.     When Mr. Young was a co-founder of
18   Atlas or RoundRobin, what state did he reside in?
19        A.     I believe he resided in California.
20        Q.     And when Mr. Rhome was a co-founder of
21   Atlas, what state did he reside in?
22        A.     I believe he also resided in
23   California.
24        Q.     And when Atlas was founded, what state
25   did you reside in, sir?
```



MATTHEW WILLIAM ADKISSON  30(b)(6), Confidential          July 30, 2024
In re: Daniel's Law Compliance Litigation                         44

1          A.          █████████████████████████

2    ████████████████████████████████████████████

3    ██████████████████████████████████████████

4          Q.    Okay.  You said that Atlas was

5    previously known as RoundRobin Corporation; is

6    that correct?

7          A.    In April of 2021 when the entity was

8    initially incorporated, it was incorporated as

9    RoundRobin Corporation.

10         Q.    Okay.  When did it change its name?

11         A.    I don't recall the exact dates.

12         Q.    Okay.

13         A.    I think in -- in late 2023 or early

14   2024 we renamed the entity to Atlas Data Privacy

15   Corporation.

16         Q.    Why?

17         A.    We were no longer primarily using the

18   RoundRobin brand.  We were using the Atlas brand

19   and had been using it for some time and wanted to

20   align the entity named with the primary brand that

21   we were using in the market.

22         Q.    Why was the RoundRobin brand selected

23   when you started Atlas?

24         A.    When Atlas started, we thought our

25   market would be young people, Gen Z.  We described



1  ourselves as a LifeLock for Gen Z in one way and

2  we wanted a brand that was very business to

3  consumer, B to C, one that felt light, consumer

4  friendly, something that an 18- or 22-year-old

5  might engage with and find interest in, and that

6  was behind the -- partly behind the choice of

7  RoundRobin as the brand and the entity name.

8      Q.   Okay.  What was behind the change to

9  Atlas?

10     A.   Over time we moved away from --

11         MR. LEE:  Let me just lodge an

12     objection first.  Asked and answered.

13         Go ahead and answer again.

14     A.   Over time we moved away from that

15  initial demographic and developed branding and

16  brands and names that we preferred.

17     Q.   What was the demographic that you were

18  seeking to attract with the Atlas name?

19     A.   I don't think Atlas was oriented

20  towards any particular demographic the way that

21  RoundRobin had been.  I think it was simply a

22  single word, something that we thought could

23  become a ubiquitous brand someday, a name people

24  liked.

25     Q.   Were there any other names that



 1  RoundRobin or Atlas went by during its history,
 2  existence?
 3        A.    There were.
 4        Q.    What are the other names?
 5        A.    CrowdShield.  Derivations of Atlas, so
 6  Atlas Privacy, Atlas Protect.
 7        Q.    Any others?
 8        A.    Those are the ones that I can recall.
 9        Q.    Okay.  And who were -- you said "we"
10  changed the name of RoundRobin.  Who are the "we"
11  who changed the name of RoundRobin to ultimately
12  be Atlas?
13        A.    When I say "we" in that context, it
14  would have -- it would have been a rolling
15  discussion culminating in a consensus decision
16  executed by outside counsel to effectuate the
17  change.
18        Q.    So is your testimony that it was you
19  and outside counsel and no other owners or
20  investors in the company at that time?
21              MR. LEE:  Objection.  Mischaracterizes
22        testimony.
23        A.    That's not my testimony, no.
24        Q.    Okay.  So who are the "we" other than
25  outside counsel who were involved in the change of



```
 1        order and rulings on this topic.  So we'll

 2        see.  Thanks.  Off the record.

 3             THE VIDEOGRAPHER:  Off the record at

 4        11:16.

 5             (Recess was taken from 11:16 to 11:35.)

 6             THE VIDEOGRAPHER:  Back on the record

 7        at 11:35.

 8             (Atlas Exhibit 2, Order dated June 3,

 9        2024, marked for identification.)

10   BY MR. STIO:

11        Q.    Mr. Adkisson, I want to show you what

12   we have marked as Atlas 2.  For the record, it is

13   an order that the court entered on June 3rd, 2024,

14   docket entry number 36 in the case number

15   1:24-cv-03998.  Take a second to look at that.

16             (Document review.)

17        Q.    And when you are ready, if you can turn

18   to page 11.

19        A.    Okay.  I'm on page 11.

20        Q.    Thank you, sir.  So under Atlas 2, page

21   11, paragraph 2, it says that:  "Plaintiffs, on or

22   before July 31, 2024, shall produce a witness

23   under Rule 30(b)(6) of the Federal Rules of Civil

24   Procedure prepared to discuss the following

25   topics."  Do you see that paragraph 2, sir?
```



```
 1          A.    I do.
 2          Q.    Okay.  I want to go through each of the
 3    topics with you.  Are you prepared to testify on
 4    behalf of Atlas as to subparagraph (a) of Atlas 2,
 5    which the topic is "documents produced in response
 6    to this court order as long as the questions are
 7    relevant to subject matter jurisdiction"?
 8          A.    I am.
 9          Q.    Are you prepared and being offered to
10    testify on behalf of Atlas with regard to topic
11    (b), which is "Atlas's interest in the Daniel's
12    Law rights being asserted in the actions prior to
13    obtaining the assignments"?
14          A.    I am.
15          Q.    Are you prepared to testify on behalf
16    of Atlas with regard to paragraph (c) of Atlas 2
17    on page 11, "Atlas's decision to incorporate in
18    the State of Delaware"?
19          A.    I am.
20          Q.    Are you prepared to testify on the
21    topic which is identified on paragraph --
22    subparagraph (d) of page 11, "the process for the
23    assignments to Atlas by the Covered Persons"?
24          A.    I am.
25          Q.    Are you prepared to testify as to
```



```
 1   subparagraph (e), the topic on Atlas 2, "the
 2   assignments Atlas purportedly obtained from the
 3   Assignors, including but not limited to, when the
 4   assignments were obtained, how the assignments
 5   were obtained, the number of assignments obtained
 6   and communications about the assignments"?
 7       A.   I am.
 8       Q.   Are you prepared to testify on behalf
 9   of Atlas with regard to subparagraph (f) on page
10   12 of Atlas 2, the topic is "the services that
11   Atlas provides to its users, including the Covered
12   Persons"?
13       A.   I am.
14       Q.   Are you prepared to testify on behalf
15   of Atlas with regard to subparagraph (g) on Atlas
16   2, page 12, the topic "whether there was any
17   consideration by Atlas or any discussion by Atlas
18   with any Covered Persons regarding whether the
19   assignments would in any way impact the
20   jurisdiction of the courts in any of these
21   actions"?
22       A.   I am.
23       Q.   And are you prepared to testify on
24   behalf of Atlas, and being offered to testify on
25   behalf of Atlas, to subparagraph (h) on page 12,
```



```
 1   the topic "any participation or interest in the

 2   above-captioned actions by any purported

 3   Assignor"?

 4        A.    I am.

 5        Q.    Okay.  And I want to go back to page

 6   11, sir, of Atlas 2.  Now, page 11 also contains

 7   document requests of documents that Atlas was

 8   ordered to produce.  Do you understand that the

 9   documents that Atlas was ordered to produce start

10   on subparagraph (1), page 9, and go through

11   subparagraph (g) on page 11, sir?

12        A.    Could you say again on page 9 where

13   that starts?

14        Q.    Say that again, sir.

15        A.    Could you say again on page 9 where the

16   list starts?

17        Q.    Yes, it starts on subparagraph (1).

18   See at the top --

19        A.    I see here (a), (b) -- can I take a

20   minute to read through this list?

21        Q.    Certainly.

22              (Document review.)

23        A.    Okay.  I've read through that list.  Do

24   you mind restating the question.

25        Q.    On page 11, the top of the page,
```



1  paragraph (1) subparagraph (f) states that among

2  the documents that Atlas was to produce are

3  "documents in Atlas's possession concerning the

4  citizenship of any such Defendant as related to

5  subject matter jurisdiction (excluding basic

6  contact information)."  See that, sir?

7      A.    I do.

8      Q.    Did Atlas perform a search to locate

9  documents responsive to subparagraph (f)?

10     A.    We did.

11     Q.    Can you describe what you did?

12     A.    We searched all employee inboxes.  We

13 searched our other communication platforms that we

14 use to communicate internally.

15     Q.    Anything else?

16     A.    I verbally asked every employee whether

17 they had any document that would be relevant to

18 this that would not come up in one of those

19 searches.

20     Q.    Anything else?

21     A.    I don't believe so, no.

22     Q.    How did they search for documents

23 responsive to the category under subparagraph (f)

24 of Atlas 2?

25     A.    We have the ability to perform a global



```
 1        A.    If I'm understanding your question
 2   correctly, it has happened, because, as you know,
 3   there are named plaintiffs who are participating
 4   in these Complaints.
 5        Q.    Were there communications with the
 6   named plaintiffs where they advised Atlas "I want
 7   to be a named plaintiff"?
 8        A.    There were many people who reach out to
 9   us and we would direct them to our counsel and
10   counsel worked out the specifics of who -- well, I
11   won't go into that, but counsel was responsible
12   for that area.
13        Q.    So you said there were many people who
14   reached out about being a named plaintiff.  Who
15   were those many people, just any of them?
16        A.    That was not my testimony.
17        Q.    Okay.
18        A.    There were many people who reached out
19   to us feeling very strongly that -- well, there
20   were many people who reached out to us for many
21   different reasons.  For example, between June and
22   December of 2023, we were dealing with about one
23   serious incident within New Jersey per week.
24   Let's define a serious incident as death threats
25   or serious threats of violence targeted at one of
```



1   our members:  A PBA officer, one of their family
2   members, a state trooper, one of their family
3   members, someone like that, and we would respond
4   and help them as best we could with whatever
5   situation they were facing.  Oftentimes or
6   sometimes there were threats that rose to the
7   level where we wanted to refer an individual to an
8   attorney to see if there was any additional help
9   that could be provided, and over the course of
10  time we directed many individuals to our counsel,
11  and my understanding is those discussions led to
12  certain individuals participating as named
13  plaintiffs in the actions.
14       Q.    People, you said, were reaching out
15  between June and December about serious incidents
16  involving a user of Atlas' services; is that
17  correct?
18       A.    I don't -- that's not what I said, but
19  in that time period we were dealing with a very
20  high volume of threat traffic directed at our
21  individuals, our community of law enforcement and
22  judges and prosecutors in New Jersey, and so we
23  had a lot of opportunities to meet with people and
24  hear their stories and in many cases would refer
25  them to our counsel so that they would have



 1  someone that they could chat with about other

 2  options.  Sometimes people would just want to talk

 3  and share their story and...

 4      Q.    The people you met with were users of

 5  your service; correct?

 6      A.    Sometimes they were, sometimes they

 7  were not.

 8      Q.    When you direct them to meet with your

 9  counsel, is that counsel representing you in these

10  lawsuits?

11      A.    When people would come in, we would

12  refer them to -- to counsel, not just our counsel,

13  we would refer them to -- but in some cases we

14  would introduce them to our counsel, yes.

15      Q.    Okay.  So let's talk about who is

16  Atlas' counsel that you would refer them to?

17      A.    We have a number of outside firms.

18  Genova Burns, who has -- is no longer outside

19  counsel for us, but was for a certain period of

20  time.  PEM Law.  Boies Schiller.  Morgan & Morgan.

21  Perkins Coie.  Holland & Hart.  Maybe some

22  other -- we have likely some other smaller firms

23  for outside counsel.  I can't recall.

24      Q.    Do you recall any instance when you

25  referred someone to one of these smaller firms



1   that you can't recall?

2       A.    No.

3       Q.    You also said that during June and

4   December 2021 Atlas would respond and help

5   individuals who were facing serious incidents with

6   the situation they were facing; correct?

7       A.    Yes.

8       Q.    What services did you provide Atlas to

9   respond?

10      A.    We would try to do whatever we could to

11  help.  Sometimes that took the form of just

12  talking with somebody, meeting with them and

13  sharing our experiences that we had seen with

14  other individuals who went through the same types

15  of situations.  What I have come to learn is when

16  you are targeted as an individual, most people,

17  even though they are very strong and stoic,

18  certainly physically very tough in many cases in

19  law enforcement, that it's a very difficult mental

20  process for them to go through and their world

21  narrows and they feel like they are in the middle

22  of a category 5 hurricane.  It's easy to lose

23  perspective.  It's easy to lose sight of the fact

24  that the hurricane passes and moves on to target

25  somebody else.  So sometimes we would just go out

1   and sit with people for a couple hours and talk

2   them through it.

3        Q.    Okay.  So the services -- between June

4   and December 2021 of serious incidents when you

5   provided services, it included talking, meeting

6   with people, sitting down with people, sharing

7   experiences.  Any other services that Atlas

8   provided?

9        A.    We would -- we would connect them with

10  other people who had gone through similar

11  experiences.

12       Q.    Anything else?

13       A.    We would in some cases help connect

14  them with other individuals who might be able to

15  help them, depending on whatever the fact pattern

16  was in their case.

17       Q.    Anything else?

18       A.    We would advise them on cybersecurity

19  best practices, things to look out for related to

20  identity theft.

21       Q.    Anything else you can recall?

22            MR. LEE:  He is still trying to answer

23       your question, sir.  Just give him a second.

24       A.    You are asking me to go back and I want

25  to make sure my answer is responsive.



```
 1                 MR. LEE:  Take your time.
 2         A.     We had cases of doxxing in 2023 where
 3   extremist groups would target specific officers or
 4   state police and they would host their home
 5   addresses and photos of their family members on
 6   domains intended to be gathering points for
 7   violent extremists, and so we would advocate, we
 8   would use our resources and our network to reach
 9   out to the web hosts or the domain registrars in
10   those cases to try to get those websites taken
11   down.
12         Q.     Got it.  Anything else?
13         A.     You know, we provided so many different
14   types of what you might call help to people.  I'm
15   sure that I'm leaving some out.  I'm not sure what
16   this necessarily has to do with subject matter
17   jurisdiction, but let me just say that we did
18   everything we could when we would respond to an
19   incident of an individual having been doxxed to --
20   or a group of individuals having been doxxed or
21   swatted or threatened, we did everything that we
22   thought we could do to help them navigate through
23   that experience.
24         Q.     The specific items or services that you
25   remember sitting here today you testified to;
```



```
 1   correct?

 2        A.    Including the bit I said last, yes,

 3   where I can't -- I'm not sure I could articulate a

 4   list of every service that we provided, but we --

 5   our goal was we did everything we could to help

 6   these individuals once they had been targeted to

 7   help them get through it.

 8        Q.    What do you mean by everything you

 9   could, I just don't understand that, what did you

10   do when you say "everything we could"?

11             MR. LEE:  Asked and answered.

12        A.    I'm not sure I can provide much more of

13   an answer than I already have.

14        Q.    If you go back to Atlas 2, please --

15        A.    Which page?

16        Q.    Page 12, sir.  You are here today with

17   regard to subparagraph (f) on the top of Atlas 2,

18   page 12, to testify as to the services that Atlas

19   provides to its users including Covered Persons;

20   correct?

21        A.    That's my understanding of this

22   deposition, yes.

23             (Atlas Exhibit 3, letter dated June 24,

24        2024, marked for identification.)

25             MR. STIO:  Sorry about that, James.  I
```



```
 1        didn't know it didn't get up to you.
 2               MR. LEE:  What's that?
 3               MR. STIO:  Sorry I didn't throw it far
 4        enough.
 5               MR. LEE:  It's all good.
 6        Q.    I want to show you what's been marked
 7   as Atlas 3.  For the record, it is a June 24th,
 8   2024, letter from PEM Law on letterhead from Rajiv
 9   Parikh, and I will make a representation that this
10   is the format in which we received the letter.
11               MR. PARIKH:  Angelo, is there another
12        page to this?
13               MR. STIO:  That's why I made the
14        representation.  We didn't -- you never sent
15        us the third page.  We don't have it.
16               MS. JONAITIS:  I will represent that in
17        the cases handled by Troutman --
18               THE COURT REPORTER:  I can't hear you.
19               MS. JONAITIS:  Sorry.  In the cases
20        handled by Troutman, all of the letters for
21        June 24th that said they were three pages we
22        only received pages 1 and 2.
23               MR. STIO:  Raj, we also -- there was --
24        other defendants only received 1 and 2 too.
25        We never received the third page.
```



```
 1   counsel to prepare this letter?
 2              MR. LEE:  Objection to form.  Lack of
 3        foundation.
 4        A.    I'm not sure I understand the scope of
 5   the question.  If you mean did we provide some of
 6   the material that would be referenced in here,
 7   then the answer would be yes.
 8        Q.    Did you provide any information with
 9   regard to -- on page 2 --
10              MR. LEE:  Can I just have a standing
11        objection on foundation grounds for all
12        questions related to Exhibit 3, Atlas 3?
13              MR. STIO:  Noted.
14              MR. LEE:  Thanks.
15        Q.    Did you provide any information on page
16   2 with regard to the small number of Covered
17   Persons, as defined in each of the complaints,
18   where assignments to Atlas postdated the filing of
19   the complaint?
20        A.    I think this would get into privileged
21   discussions with counsel.
22        Q.    I don't want the contents.  I want to
23   know if you had those discussions.
24        A.    Could you restate the question.
25        Q.    Sure.  Did you have discussions with
```



```
 1    regard to the assignments to Atlas that were
 2    obtained after a complaint was filed?
 3         A.    So you are asking me if we ever
 4    discussed those type of assignment confirmations,
 5    I think the answer would be yes, if I'm
 6    understanding your question.
 7         Q.    Okay.  And did you -- other than
 8    counsel, did you have any of those discussions of
 9    assignment confirmations after a complaint is
10    filed with any of the individuals, the assignors?
11         A.    I don't believe so, no.
12         Q.    Did Atlas produce in this case all
13    templates of the assignment confirmations that
14    were sent to the assignors?
15              MR. LEE:  Can you repeat that.  I'm
16         sorry.
17              MR. STIO:  Sure.
18         Q.    Did Atlas produce in this case the
19    templates that were used to send assignment
20    confirmations to the assignors?
21         A.    We produced a template for each type of
22    assignment confirmation that would have been sent
23    to an assignor in one of these cases.
24         Q.    You said "each type of assignment
25    confirmation."  How many types are there?
```



```
 1          A.    I believe there is a single template
 2     for -- a single template and it's extensible to
 3     cover a phone number or a home address, but I
 4     believe it's just a single template.
 5          Q.    Was there any type of separate template
 6     that was used to send assignment confirmations to
 7     individuals where an assignment was executed after
 8     a complaint was filed?
 9          A.    I'm not aware of one, no.
10          Q.    Okay.  And the template is a template
11     when there is a phone number that's for
12     non-disclosure or a template where there is a home
13     address for non-disclosure, those are two
14     templates that you were mentioning?
15          A.    I'm not sure if you would consider
16     those separate templates if the variation is the
17     piece or the type of data referenced, but I think
18     yes.
19          Q.    Thank you.
20                Are you able to identify, Atlas, who
21     the individuals who received assignments that
22     postdated the complaint are?
23          A.    So you are asking me could we for each
24     separate action identify within that action
25     individuals who had an assignable claim but the
```



1  assignment did not occur until after the action

2  was filed?

3      Q.    Correct.

4      A.    Yes.

5      Q.    Can you explain how you would get that

6  information?

7      A.    We are the ones sending assignment

8  confirmations and our system understands the date

9  on which a Daniel's Law takedown notice was

10  delivered to a particular recipient and who had

11  sent that notice, the covered person who had sent

12  the notice for whom we delivered it, putting those

13  pieces of information together we can understand

14  individuals who would fall into the category that

15  you are talking about.

16      Q.    Did you look at any documents that

17  identified the volume of individuals who received

18  an assignment confirmation after a complaint was

19  filed?

20      A.    I didn't look at any specific documents

21  to prepare for this deposition, but my

22  understanding is that it is a small number of

23  covered persons.

24      Q.    What's your definition of a small

25  number?



```
 1        A.    Less than 50 people across 142 cases
 2   in aggregate.  So not 50 people per case, but less
 3   than 50 people across all of the 142 cases.
 4        Q.    Atlas -- does Atlas have a relationship
 5   with the New Jersey State Police Benevolent
 6   Association?
 7        A.    We do.
 8        Q.    Okay.  Can you describe what that
 9   relationship is?
10        A.    They are a client of ours.  We have a
11   business relationship with them whereby they pay
12   our -- they pay us a service fee and we provide
13   access to the Atlas platform to their members.
14        Q.    How did the New Jersey State Police
15   Benevolent Association become a client of Atlas?
16        A.    They expressed an interest in the type
17   of services that we were providing and they
18   invited us to come and chat with them and we did,
19   and that ultimately led to a business
20   relationship.
21        Q.    Did Atlas reach out to -- can I use the
22   word "PBA" for --
23        A.    Uh-huh.
24        Q.    Did Atlas reach out to the PBA to have
25   these discussions or was it the other way around?
```



1    A.    I believe that I may have -- well, let

2    me back up.  When we decided to explore Daniel's

3    Law, when we learned about Daniel's Law and

4    decided to explore providing services that would

5    be relevant to Daniel's Law, as is typical in my

6    business of going into a new field that you don't

7    know much about where you don't know anyone, I

8    made a number of cold calls, maybe a few dozen,

9    people I thought might be relevant to helping us.

10   Somehow in that process I got in touch with

11   somebody at the PBA.  I don't recall who.  That

12   conversation was fairly brief.  It allowed me to

13   explain who we were, what we were hoping to do,

14   what our background was, and that was the end of

15   that chain of communication.

16   Q.    Got it.

17   A.    ███████████████████████████

18   ████████████████████████████████████████

19   ████████████████████████████████████████

20   █████████████████████████████████████

21   ███████████████████████████████████████

22   ████████████████████████████████████████

23   ██████████████████████████████████

24   ██████████████████████████████████

25   ████████████████████████████████████████



 1    like that, and it became common practice any time

 2    we started an entity of this type to put it in

 3    Delaware.

 4         Q.    How many times have you incorporated an

 5    entity in Delaware?

 6         A.    What do you mean by "incorporated"?

 7         Q.    I want to use the definition you said

 8    in your answer.  You have incorporated numerous

 9    entities in Delaware.  How many have you

10    incorporated?

11         A.    So when I use that -- that term in that

12    way, this is similar to the definition of founder

13    or co-founder.  As I understand it, there are

14    different ways in which one might, quote unquote,

15    incorporate, so for instance, one could file

16    incorporation paperwork directly with the

17    Secretary of State, one could direct their lawyers

18    to incorporate in a certain jurisdiction, one

19    could be involved in discussions as part of a

20    founding team to start a company that ended up

21    being incorporated in Delaware.  So using that

22    definition of early-stage involvement where I had

23    some input into where the jurisdiction or state of

24    residence of the entity should be, I would say I

25    have incorporated or participated in the



1  incorporation of probably twenty companies in

2  Delaware.

3      Q.    Who made the determination of the

4  65 percent/35 percent net split outlined in

5  Atlas 4 under revenue share or recoveries under

6  the assignment confirmations?

7          MR. LEE:  That's privileged.

8      A.    I think that would get into what we

9  talked about before, which is discussions with

10  counsel.

11          MR. STIO:  Okay.  Are you instructing

12      him not to answer the question who made the

13      determination of the split?

14          MR. LEE:  I am telling him not to

15      answer to the extent that it waives

16      privilege.  He just answered that question.

17          MR. STIO:  You can answer the question

18      then.

19          MR. LEE:  He just did it.

20      A.    It would take -- the answer to get into

21  any more specificity would take me into areas of

22  privilege.

23      Q.    In Atlas 4 the paragraph above Recovery

24  Share on Recoveries Under Assignment

25  Confirmations, it's entitled Assignments - Actions



```
 1  where Atlas or its affiliates are the plaintiff.
 2  Do you see that, sir?
 3       A.    You are talking about -- I'm not sure
 4  if this is a numerette, but where the -- where it
 5  says (ii) in parentheses Assignments?
 6       Q.    Assignments - Actions where Atlas or
 7  its affiliates are plaintiffs.
 8       A.    Yes, I see that.
 9       Q.    Okay.  There is a provision here --
10  one, two, three, four, five, six, seven, eight,
11  nine -- ten lines down where it says in part, if
12  you want to follow along with me:  The Assignee
13  will have the exclusive right to bring such civil
14  enforcement actions anywhere in the world with
15  respect to takedown notices.  Do you see that?
16       A.    Am I allowed to mark this up?  And, if
17  so, could you get a pen?  It might make it a
18  little easier for me to follow along.
19             MR. LEE:  Why don't you use my copy.
20             THE WITNESS:  Okay.
21             MR. LEE:  That's the official copy.  I
22        will sit with you.
23       Q.    Would it help if I pointed it out to
24  you?
25       A.    Sorry, Mr. Stio.  Yeah, you said the
```



```
 1  counsel that we engaged may have provided feedback
 2  on any documents of this type.  More than that I
 3  cannot say.
 4      Q.   Was Boies Schiller involved in
 5  providing feedback on Atlas 4?
 6      A.   Again, I'm gonna just be -- I'm gonna
 7  say what I said before, which is I'm not
 8  comfortable getting into that, into those
 9  discussions with our counsel.
10          MR. STIO:  Are you instructing him not
11      to answer?
12          MR. LEE:  He is answering your
13      question.
14          MR. STIO:  He is not.
15      Q.   Mr. Adkisson, I am not asking you for
16  any type of legal communications you had.  Who,
17  what counsel, drafted Atlas 4?
18      A.   I feel like I've answered that question
19  to the best of my ability.
20      Q.   Okay.  Can you repeat the answer then,
21  because I don't recall you answering it.
22      A.   Any number of outside counsel could
23  have provided feedback on this document.  To go
24  into the specifics of who, what, why, where and
25  when, I think, would be getting into areas of
```



```
 1   privilege that I would be uncomfortable answering.
 2        Q.   I am not asking you what, why, where,
 3   when, I am asking you who, and you still haven't
 4   answered it.  What are the names of the firms that
 5   drafted Atlas 4?
 6             MR. LEE:  You can answer that specific
 7        question if you recall.  Just that narrow
 8        question.
 9        A.   I don't recall.
10        Q.   Are you aware of any named plaintiff in
11   any of the cases that are the subject of today's
12   deposition that has a counsel that's different
13   than the counsel representing Atlas?
14        A.   Sorry.  Would you repeat that one more
15   time.
16        Q.   Sure.  Is there any attorney of a named
17   plaintiff in the cases captioned in the Order as
18   Atlas 2 that is being represented by a counsel
19   different than a counsel that's representing
20   Atlas?
21        A.   What do you mean by "represented by"?
22        Q.   Have they engaged a lawyer to represent
23   them in the litigation other than Boies Schiller,
24   Morgan & Morgan or Genova Burns or PEM Law, that
25   you are aware of?
```



```
 1                    MR. LEE:  The named plaintiffs?
 2                    MR. STIO:  Correct.
 3          A.    So would any of the named plaintiffs --
 4    so the named plaintiffs are two Jane Does, Edwin
 5    Maldanado, the Maloneys, Pat Colligan, Pete
 6    Andreyev, William Sullivan, have any of those
 7    individuals retained counsel other than the four
 8    firms you mentioned for the purposes of
 9    representing them in these actions, in these
10    lawsuits?
11          Q.    Correct.
12          A.    Not to my knowledge, no.
13          Q.    Atlas prepared a spreadsheet showing
14    the date when assignment confirmations were sent
15    out that was produced in this case; correct?
16          A.    Yes.
17          Q.    And you prepared one for each of the
18    data broker litigations or credit reporting
19    agencies that they are involved in; correct?
20          A.    My understanding is that we produced an
21    assignment confirmations list for each of the
22    defendants in federal court.
23          Q.    Do you recall the date when the
24    assignment confirmations were sent out to any of
25    the covered people?
```



```
 1        A.    There was no one particular date when

 2   assignment confirmations would have been sent to

 3   covered persons.  It's a process that occurs over

 4   time on a rolling basis.

 5        Q.    Is it an automated process?

 6        A.    Parts of it are automated and parts of

 7   it are manual and require a human to be in the

 8   loop.

 9        Q.    Do you know when the assignment

10   confirmations began to be sent out?

11        A.    I believe it would have been in early

12   February.

13        Q.    You said it was a multi-day process; is

14   that correct?

15        A.    Well, if you ask when was -- when were

16   assignment confirmations sent to covered persons,

17   there is no one point in time when that occurs,

18   because you are asking about a continual process

19   that could occur any time that there are

20   assignment confirmations that need to go out.

21             MR. LEE:  Are we done with this one,

22        Angelo?

23             MR. STIO:  Not yet.  Just hold it out

24        there.

25             (Atlas Exhibit 5,
```



1  as Atlas 5 has an inaccurate date for the date of

2  assignment confirmation.  Is it your testimony

3  that you cannot answer that question?

4       A.    I feel like I did answer that question.

5  I -- if you are asking if I have any reason to

6  believe that the individuals who worked on this

7  would not have produced information, I guess --

8  sorry.  Could you -- I just want to make sure I am

9  clear and accurate in my answer.  Would you mind

10  re-asking the question.

11       Q.    Yes.  The documents that Atlas produced

12  that show a list of assignments and assignment

13  confirmations for each individual action, is the

14  information in those documents accurate?

15       A.    I have no reason to believe that it is

16  not accurate.

17       Q.    Under the terms of service, which I

18  believe is Atlas 4, if you could jump back to

19  that, sir.

20       A.    Okay.  I'm on Atlas 4.

21       Q.    If you can go to ATLAS underscore

22  REMAND 00000003.  Under Daniel's Law it covers

23  former, active or retired judicial officers, law

24  enforcement officers; correct?

25       A.    Are you asking me about what's on this



 1  page or are you asking about my understanding of
 2  Daniel's Law, the statute?
 3      Q.    Starting with your understanding of
 4  Daniel's Law, the statute.
 5      A.    My understanding of Daniel's Law is
 6  that it creates a category of what it deems
 7  covered persons to whom it grants certain safety,
 8  security rights, privacy rights, and that that
 9  group includes former or active, it I think
10  reverses those, so active or former judges,
11  prosecutors and law enforcement officers and any
12  immediate family member, and I believe that --
13  that's my understanding of the statute, that's
14  right.
15      Q.    Atlas as an entity isn't a covered
16  person under the Daniel's Law; correct?
17      A.    Atlas the corporate entity?
18      Q.    Yes.
19      A.    No, we would not be a covered person.
20      Q.    The terms of service in Atlas 4, are
21  they available anyplace else other than on the
22  website for Atlas?
23          MR. LEE:  Objection.  Vague.
24      A.    Are they available anywhere other than
25  on the website?  Yes.



 1        Q.    Where are they available, sir?

 2        A.    During the sign-up process individuals

 3   have the option to download a copy of the terms of

 4   service and we know that individuals have done

 5   this.

 6        Q.    How do you know that?

 7        A.    I think we record the -- or either we

 8   or the clickwrap provider would record when that

 9   action is taken.

10        Q.    I want to go to the section on Atlas 4

11   under assignment confirmations.

12        A.    Do you have a page number?

13        Q.    I will get you that, sir.  000006.

14        A.    Okay.  I'm on page 6.

15        Q.    Can you walk me through the process of

16   how the assignment confirmation is issued and then

17   accepted by the assignors?

18        A.    Upon signing up with Atlas and being

19   presented with this terms of service, a user would

20   presumably I think in the cases you are asking

21   about have accepted this terms of service.  This

22   terms of service makes a provision for Atlas to

23   send that individual an assignment confirmation,

24   which causes their claim to be assigned to Atlas

25   or a designated affiliate.  Sometime after



 1  accepting this terms of service utilizing the

 2  services an Atlas -- excuse me -- an assignment

 3  confirmation could be sent to that individual,

 4  which would cause their claim to be assigned.

 5      Q.    Is there a clickwrap agreement or any

 6  type of agreement associated with the assignment

 7  confirmation?

 8      A.    If by assignment confirmation you mean

 9  the notice that under the terms Atlas has to

10  provide to the individual to effectuate the

11  assignment, there is no clickwrap involved in that

12  process, no.

13      Q.    Is there any other type of agreement

14  involved in that process?

15      A.    The terms of service here.

16      Q.    Okay.  With regard to the terms of

17  service, if there is a change in the terms of

18  service, is there a clickwrap agreement with

19  regard to acceptance of changes?

20      A.    My understanding is that the terms of

21  service allows for updates that would be binding

22  on the individuals who had previously agreed to

23  the terms.  There are instances where an

24  individual might re-engage with a certain portion

25  of the Atlas platform and they would be presented



1   with the updated terms of service and it would

2   have a clickwrap included as part of that process.

3          Q.    If there is a change to the terms of

4   service, is there any notice given to the

5   assignors?

6          A.    So you are asking if there is a change

7   to the terms of service, is there any notice that

8   we provide to assignors, meaning covered persons

9   whose claims have been assigned?

10         Q.    Or just any -- let's make it even

11  easier.  A user of the Daniel's Law services, if

12  there is a change in the terms of service, is

13  there a notice that goes out that there is a

14  change?

15         A.    We would post the updated terms of

16  service in all the relevant areas where it would

17  need to be included in our platform.

18         Q.    Other than that, is there any type of

19  notice?

20         A.    Not -- not a universal notice, which I

21  think is what you are asking about, no.

22         Q.    And in terms of the clickwrap

23  technology that you use for acceptance of the

24  terms of service, has that clickwrap been in

25  effect since Atlas was created or incorporated?



```
 1        A.    No.
 2        Q.    When did it go into effect?
 3        A.    I don't remember the specific date.  My
 4   best recollection is sometime in late 2022 or
 5   maybe very early 2023.
 6        Q.    Is there a document or record that
 7   would tell you when that went into effect?
 8        A.    We have a contract with the vendor.
 9   I'm sure there is a date on that contract.
10             (Atlas Exhibit 6, Atlas Privacy Order
11        Form, Bates stamped ATLAS-REMAND_00000369
12        through ATLAS-REMAND_00000373, marked for
13        identification.)
14        Q.    I want to show you what's been marked
15   as Atlas 6.
16        A.    I see Atlas 6 here.
17        Q.    Okay.  It is a document with Bates
18   label ATLAS-REMAND 0000369 through 373.  Do you
19   see that, sir?
20        A.    I see the first page I have is 369 and
21   the last page I have is 373.
22        Q.    ███████████████████████████████████
23   ██████████████████████████████████
24        A.    ██████████
25        Q.    ████████████████████████████████████
```



```
1        Q.    Did anyone at Atlas have discussions
2   with them about choice of venue?
3        A.    Not to my knowledge.
4              MR. LEE:  We have gone an hour and
5         fifteen.
6              MR. STIO:  I want to finish one more
7         thing and then we can take a break.
8              MR. LEE:  Are you okay to go a little
9         longer?
10             THE WITNESS:  All good.
11             (Atlas Exhibit 8, Atlas Privacy Order
12        Form, Bates stamped ATLAS-REMAND_00000379
13        through ATLAS-REMAND_00000383, marked for
14        identification.)
15       Q.    I am going to show you what's been
16  marked as Atlas 8.  Bates numbers are ATLAS-REMAND
17  underscore 0000379 through 383.
18       A.    I have number 8.  The first page is 379
19  and the last page is 383.
20       Q.    Do you know what Atlas 8 is?
21       A.    This looks to be an agreement with the
22  New Jersey State PBA Local 105.
23       Q.    That's your signature on the bottom of
24  page 1 of Atlas 8?
25       A.    Yes.
```



MATTHEW WILLIAM ADKISSON  30(b)(6), Confidential          July 30, 2024
In re: Daniel's Law Compliance Litigation                        141



```
 1       Q.   ████████████████████████████
 2  ████████████████████████████████████
 3  ████████████████████████
 4       A.   ███████████████████████████
 5  ████████████████████████████████████████
 6  ████████████████
 7       Q.   ████████████████████████████
 8  ███████████████████████████
 9       A.   █████████
10       Q.   ████████████████████████████████
11  ██████████
12       A.   ████████████████████████████
13  ████████████
14       Q.   ████████████████████████████
15  ████████████████████████████████████
16  █████████████████
17       A.   █████████████████████████
18  ███████
```

19       Q.   On page 5 of Atlas 8, do you recall any
20  discussions about the venue and jurisdiction
21  provision in Atlas 8?
22       A.   I think in this case, as the others,
23  neither we nor they cared for this choice of
24  venue.  I can't recall any discussion with them on
25  this point.



1     Q.    Do you know how the New York choice of
2   venue got put in this agreement?
3     A.    I do not.
4     Q.    Do you know how many members of the
5   Local 105 signed up for Atlas' services?
6     A.    Sorry.  Just to finish my answer on the
7   last question, given that we didn't particularly
8   care about the choice of venue and neither did
9   they, I imagine that New York County in this
10  document was simply part of the template that
11  became kind of the default that we would use, but
12  I'm not really sure.  Sorry.  What was the last
13  question you asked me?
14    Q.    How many members of Local 105 signed up
15  for Atlas' services?
16    A.    I couldn't tell you.
17    Q.    Is it less than 4,100 as outlined in
18  the agreement of how many you would make
19  available?
20    A.    ████████████████████████████████
21  ████████████████████████████████████
22  ██████████████████████████████████████
23  ██████████████████████████
24  ████████████████████████████████
25  ████████████████████████████████



```
 1   more claims that were assigned; correct?
 2        A.    We would not send an assignment
 3   confirmation to an individual who we did not
 4   believe had a claim that could be assigned.
 5        Q.    And Atlas believes that it now has the
 6   right to bring all of those assigned claims in
 7   this litigation; correct?
 8        A.    We filed the litigation.  I'm not
 9   sure -- when you reference rights, legal rights
10   and terms like that, that's where I would say,
11   again, I'm a lay person, so I can't speak to all
12   the legal rights that Atlas may have.  I would
13   defer to my counsel on that.
14        Q.    You are saying you don't know if you
15   have the right to bring the assigned claims in
16   this litigation?
17             MR. LEE:  Objection.  Mischaracterizes
18        testimony.
19        A.    That's not the way I understood your
20   question.  Do you mind repeating the previous
21   question?
22        Q.    Do you believe that Atlas has the right
23   to bring each of the claims that you say was
24   assigned to Atlas by the covered persons?
25        A.    If I'm understanding your question
```




```
 1   correctly, do I believe that Atlas having been

 2   assigned claims under Daniel's Law has the right

 3   to go to court and prosecute those claims, the

 4   answer is yes.

 5        Q.    And in fact, in the various lawsuits

 6   here, you are pursuing each one of those assigned

 7   claims; correct?

 8        A.    No.   There are assigned claims that

 9   are -- maybe I am misunderstanding your question.

10   There are claims that have been assigned that are

11   not part of these lawsuits.

12        Q.    But the claims in these lawsuits that

13   have been assigned you are pursuing; correct?

14        A.    What do you mean by "in these

15   lawsuits"?

16        Q.    The claims at issue in the lawsuits you

17   have commenced to date, Atlas is pursuing all of

18   them together; correct?

19        A.    I don't know what you mean by

20   "together," and again, the reason I am trying to

21   be very precise is that there are some edge cases,

22   for instance, we talked earlier about there being

23   a small number of individuals who were sent

24   assignment confirmations after the filing date of

25   a particular case and, you know, I think I had
```



```
 1   said fifty or less across the entire swath of
 2   cases, so when you ask a question, I am trying to
 3   be very precise, I am trying to understand what
 4   the scope and bounds of your question are, which
 5   is why I am taking my time to think through it.
 6        Q.    Okay.
 7        A.    But --
 8        Q.    Go ahead.
 9        A.    Could you -- so with that as the
10   preface, if you could reask the question, I'll --
11        Q.    Just take my -- my case, one case.
12        A.    That's helpful if you ask me a question
13   about a specific case.
14        Q.    Okay.  Atlas purports to be the
15   assignee of over 19,000 claims in my case;
16   correct?
17        A.    I don't have your case in front of me,
18   so I'm not sure if it's 19,000, but let's say in
19   the ballpark, yes.
20        Q.    And in that case Atlas is pursuing each
21   one of those assigned claims; correct?
22        A.    I'm not trying to be difficult.  Again,
23   when you say "pursuing each one of those assigned
24   claims," we are taking action as Atlas with all of
25   these claims having been assigned to us and we are
```



```
1    attempting to prosecute them all to achieve

2    compliance and a just outcome for the folks

3    involved.

4         Q.   Okay.  If Atlas thinks that any one of

5    the covered persons' claims should be aggregated

6    and prosecuted under subsection (ii) and decides

7    it wants to send an assignment confirmation for

8    any of those covered persons, how does it

9    determine which claims it wants to aggregate?

10        A.   I'm sorry.  Could you ask that question

11   again.

12             MR. CHEIFETZ:  Read it back, please.

13             (Record read.)

14        A.   As I understand your question, you are

15   asking the same question that was already

16   substantively answered, which is how do we decide

17   who to --

18        Q.   Let me rephrase.

19        A.   -- send assignment confirmations to?

20        Q.   Different question, so let me make it

21   clear.

22             Why were -- you had 19,000 some-odd

23   assignment confirmations that went out shortly

24   before these lawsuits; correct?

25        A.   No, I'm not sure that's correct.  I
```



```
 1         Q.    -- lawsuits, has Atlas received any
 2    ██████████████████████████████████████████████
 3    covered person, assignor, inquiring about pursuing
 4    these claims as a class action as opposed to as a
 5    grouping of up to 19,000 assignments?
 6         A.    So if I am understanding your question,
 7    ██████████████████████████████████████████████████
 8    ███████████████████████████████████████████████
 9    can -- whether a class action may have something
10    to do with these claims.  I can't recall any
11    instances of that, no.
12         Q.    Okay.  I want to switch subjects a
13    little bit, ask you just a couple of questions
14    about the split of fees.  I know you have got some
15    questions about that earlier, but the terms of use
16    and the split of fees of 65 percent/35 percent.
17    Well, okay.  Just to close the loop on that, I
18    asked about phone calls.
19              E-mails or other types of
20    communications related to any of these covered
21    persons, assignors, asking about class actions as
22    opposed to the mass grouping of up to 19,000
23    claims?
24         A.    Again, this is not part of the scope
25    that I prepared for, but I cannot think of any
```



```
 1   instances of that offhand, no.
 2        Q.    All right.  So on the split of fees,
 3   65 percent to the covered person, 35 percent to
 4   Atlas, you mentioned earlier that the split of
 5   fees is privileged litigation strategy.  Did I
 6   hear that correctly?
 7        A.    Well, some language laying out some of
 8   what you are talking about is publicly included in
 9   the terms of service, which is a document that is
10   not privileged.
11        Q.    Why did Atlas choose to let the covered
12   persons keep 65 percent?
13             MR. LEE:  Asked and answered.  Object
14        to form.
15        A.    Again, any -- any discussions around
16   the -- around those types of terms I would view as
17   part of litigation strategy and it would fall into
18   that privileged area.
19        Q.    Was that percentage, 65 percent,
20   negotiated with any of the covered persons?
21        A.    I'm not sure what you mean by
22   "negotiated."  When a covered person chose to sign
23   up with our platform, they went through that
24   sign-up flow that I talked about earlier, and they
25   had an opportunity to review and then agree or not
```



 1 | agree to the terms of service, and in the process
 2 | of that review they could have made a choice based
 3 | on what they saw to agree or not agree.  I don't
 4 | know if you would consider that a negotiation or
 5 | if that's part of what you mean by your question,
 6 | but...
 7 |      Q.    Was there any -- there was no
 8 | conversation where a covered person said I want
 9 | 72 percent and Atlas said well, we are only giving
10 | you 65 percent, the covered persons either have to
11 | accept the 65 percent and agree to the terms or
12 | not use Atlas' platform; correct?
13 |      A.    Well, the only way to get access to the
14 | Atlas platform -- maybe it's worth stating.  The
15 | Atlas platform will provide a different experience
16 | to someone who is a covered person versus somebody
17 | who is not a covered person.  So, for example, we
18 | have law enforcement officers outside of
19 | New Jersey that we help and have tried to help for
20 | a long time.  We have --
21 |      Q.    And I don't mean to interrupt, but I am
22 | just asking about covered persons.
23 |           MR. LEE:  You can finish what you were
24 |      saying.  He does mean to interrupt.
25 |      A.    It's responsive to your question.  Bear



```
 1                    C E R T I F I C A T E

 2

 3    STATE OF NEW YORK    )

 4                         ) ss.:

 5    COUNTY OF NASSAU     )

 6

 7              I, KRISTIN KOCH, a Notary Public

 8         within and for the State of New York, do

 9         hereby certify:

10              That MATTHEW WILLIAM ADKISSON, the

11         witness whose deposition is hereinbefore

12         set forth, was duly sworn by me and that

13         such deposition is a true record of the

14         testimony given by such witness.

15              I further certify that I am not

16         related to any of the parties to this

17         action by blood or marriage; and that I am

18         in no way interested in the outcome of this

19         matter.

20              IN WITNESS WHEREOF, I have hereunto

21         set my hand this 5th day of August, 2024.

22

23

24

25              KRISTIN KOCH, RPR, RMR, CRR
```

